| UNITED STATES DISTRICT COURT | C/M |
| EASTERN DISTRICT OF NEW YORK | |

----------------------------------------------------------X
:
MUSTAFA VELIC, :
                          Plaintiff, : **MEMORANDUM DECISION AND**
: **ORDER**
        - against - :
: 14-cv-3847 (BMC)
COMMISSIONER OF SOCIAL SECURITY, :
:
                         Defendant. :
----------------------------------------------------------X

**COGAN**, District Judge.

    1.     Plaintiff *pro se* brings this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended, 42 U.S.C. §§ 405(g) & 1383(c)(3), seeking review of a final decision of defendant Commissioner of Social Security which held that plaintiff was not disabled under sections 216(i) and 223(d) of Act and was, therefore, ineligible for Disability Insurance Benefits or Supplemental Security Income. For the reasons set forth below, defendant's motion for judgment on the pleadings is denied and this matter is remanded to the Commissioner for rehearing.[1]

    2.     The ALJ determined that plaintiff had five severe impairments: a depressive disorder, an anxiety disorder, arthritis, hyperlipidemia, and COPD. However, he also found that plaintiff had the residual functional capacity to perform light work, although limited to performing simple and repetitive tasks. The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms he alleged, but that plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were not "entirely credible."

---

[1] This case was recently reassigned to the undersigned.

3.      The ALJ conceded that the evaluations completed by plaintiff's treating psychiatrists, Dr. Dusan Pekovic[2] and Dr. Miodrag Ristich, were "somewhat consistent" with plaintiff's allegations, but found that these doctors' opinions were "unsupported by the mental status examinations of record." He noted that the Administrative Record contained "little evidence of treatment for affective disorder," but assumed that the treatment began on June 25, 2011 – the date of plaintiff's first visit to Dr. Pekovic. The ALJ then discussed the Progress Notes of plaintiff's first three visits to Dr. Pekovic – characterizing the September 5, 2011, entry as the "last treatment note"—and observed that these treatment notes revealed that plaintiff was benefitting from the medication. The ALJ noted that the Administrative Record did not contain "any further treatment records from 2011 for [his] affective disorder."

4.      The ALJ decided to give "little weight" to plaintiff's two treating psychiatrists, but elected to give "great weight" to the opinion of consulting psychologist Dr. Haruyo Fujiwaki and "some weight" to the opinions of two psychiatric consultants, Dr. Harvey Barash, and Dr. Mariano Apacible. In so doing, the ALJ did not explicitly consider the qualifications of these professionals, or the frequency, length, nature, and extent of their contacts with plaintiff. This failure is especially notable in this case, in light of the manner in which psychiatric evaluations are conducted and plaintiff's limited English abilities.

5.      Psychiatric examinations, much more than physical examination, require verbal communication. Although plaintiff has lived in the United States since 1997, he grew up and attended school in Bosnia-Herzegovina. His primary language is not English, but Serbo-Croatian. As plaintiff's lawyer informed the ALJ at the start of the hearing, plaintiff has "some

---

[2] The record is confused concerning the name of this psychiatrist. For reasons that are unclear, his Progress Notes relating to plaintiff's June 25 visit were recorded on lined pages bearing the name "Dushan Kosovich, M.D." The confusion regarding this psychiatrist's name is exacerbated by the fact that paperwork completed by Plaintiff in connection with his Social Security application refers to this doctor as "Dushan Pekoic."

difficulty expressing himself in English." This language difficulty was apparent during the hearing itself, during which plaintiff proved fairly inarticulate and generally responded in phrases rather than complete sentences.

6. Plaintiff's two treating psychiatrists are themselves immigrants from the former Yugoslavia. Dr. Ristich received his medical degree from the University of Belgrade, having graduated in 1962. See, e.g., http://health.usnews.com/doctors/miodrag-ristich-114459; https://www.zocdoc.com/doctor/ miodrag-ristich-md-4053; https://www.doximity.com/pub/miodrag-ristich-mda. He speaks multiple languages, including Serbo-Croatian. Id. Dr. Pekovic is also a graduate of the University of Belgrade Faculty of Medicine, having received his degree in 1976. See, e.g., http://health. usnews.com/doctors/dusan-pekovic-121212; https://www.doximity.com/pub/ dusan-pekovic-md. Although the doctor does not advertise his ability to speak languages other than English, his surname and history suggest that he, too, is fluent in Serbo-Croatian.

7. Plaintiff met with both of these two psychiatrists on a monthly basis for well over a year. In a report completed on December 27, 2012, Dr. Pekovic stated that he had monthly sessions with plaintiff during the 17-month period between June 25, 2011, and December 20, 2012. In a report completed January 8, 2013, Dr. Ristich stated that he had been seeing plaintiff on a monthly basis since November 2010. The doctors' statements are corroborated by statements offered by plaintiff's attorney at the hearing, in which she explained that plaintiff had two psychiatrists because "problems with insurance" prevented his seeing Dr. Pekovic exclusively, and that plaintiff was seeing "each of them at least eight times a year, usually more."

8. In contrast, Dr. Fujiwaki and Dr. Barash met with plaintiff only once. The record implies that neither of these examiners could speak Serbo-Croatian. Dr. Barash's notes indicate

that he used a "professional Bosnian interpreter" to assist in that portion of the examination in which he asked plaintiff to perform "simple calculations." The specificity of this note suggests that the interpreter was not used for other portions of the examination. Dr. Fujiwaki's report states that plaintiff's speech and language skills were "adequate," implying that their conversation was entirely in English.

9. There is no evidence that Dr. Apacible ever examined plaintiff at all. Rather, this SSA consultant appears to have made an assessment based on records provided by the Examiner. The Examiner's own decision, however, indicates that he had only Dr. Fujiwaki's report and a "report of 09/17/11" of Dushan Kosovich, M.D. -- presumably, Progress Notes from Dr. Pekovic's first three sessions with plaintiff.

10. Drs. Pekovic and Ristich not only saw plaintiff frequently and over a relatively long period of time, but were highly qualified to assess his mental health. According to the websites cited above, both doctors were Board Certified Psychiatrists and each had over 30 years of experience by the time they treated plaintiff. Dr. Ristich was affiliated with Lenox Hill Hospital in Manhattan, while Dr. Pekovic practiced in Manhattan but was affiliated both with Burke Rehabilitation Hospital in White Plains and Montefiore Medical Center in the Bronx.

11. None of the other three professionals were as qualified. Dr. Fujiwaki's report states that he is a psychologist affiliated with Industrial Medicine Associates, P.C., a corporation which regularly performs consultative examinations for the SSA. Dr. Barash's paperwork indicates that he is a "Phase II Physician" and a Staff Member at the Institute for Family Health, but does not indicate his specialty. Dr. Apacible may be a psychiatrist, but works as a Medical Consultant for the SSA.

12. Even though Drs. Pekovic and Ristich spoke plaintiff's language, spoke with plaintiff on a regular basis over more than a year, and were highly qualified to assess plaintiff's mental health, the ALJ elected to give their opinions less weight than less qualified professionals who had seen plaintiff at most once and could not speak his language. The ALJ provided four reasons for this decision. None of them were good reasons.

13. First, he opined that the two treating physicians' opinions that plaintiff was restricted in his activities of daily living were "largely unsupported by the record." In his report dated December 27, 2012, Dr. Pekovic opined that plaintiff was only moderately limited in this regard, in part because of his lack of energy. Less than two weeks later, Dr. Ristich opined that plaintiff has a marked restriction in his activities of daily living, noting that he relied on a friend to do shopping, house cleaning, and laundry. The ALJ rejected these opinions, noting that plaintiff could still utilize public transportation and take care of his daughter, and citing to statements plaintiff made to a social worker in which he stated that he could watch TV, make his bed, cook meals, read, get dressed and bathe.

14. The evidence cited by the ALJ not only does not contradict the treating physicians' assessments, but indirectly supports them. To be sure, plaintiff did tell the social worker that he was able to watch TV, make beds, cook meals, read, get dressed, bathe, use the toilet and groom himself. About two years earlier, however, plaintiff told another social worker that he was not only able to do these eight activities, but also to wash dishes, wash clothes, sweep and mop the floor, vacuum and shop for groceries. The fact that plaintiff omitted these five activities during his September 21, 2012 interview substantiated Dr. Ristich's claim that plaintiff could no longer shop, clean his apartment and do the laundry.

15. Dr. Ristich's claim that plaintiff was unable to shop, clean, or do laundry was directly supported by other evidence as well. Dr. Fujiwaki's report stated that, as of October 2011, plaintiff did not clean or do his own laundry. Plaintiff told Dr. Fujiwaki that sometimes his ex-wife would help with the cleaning and laundry, and that his daughter would assist with food shopping. Similarly, at his January 31, 2013, hearing before the ALJ, plaintiff testified that his ex-wife did his cleaning, shopping, and laundry.

16. The record also supports Dr. Pekovic's claim that plaintiff lacked energy. When interviewed in August 2010, plaintiff told the social worker that he spent his day "taking care of his daughter, attending appointments, doing household chores and watching TV." Two years later, he told the social worker that he spent his days taking care of his daughter and sleeping. Plaintiff told Dr. Fujiwaki that he spent his days watching TV.

17. The second reason that the ALJ gave for rejecting the treating psychiatrists' opinions related to their assessment of plaintiff's social functioning. The doctors agreed that plaintiff had marked limitations in this area. Dr. Pekovic based this assessment on the fact that plaintiff was "isolated," having "no social contacts other than his 12 year old daughter," while Dr. Ristich based his assessment on the observation that plaintiff led "a reclusive life."

18. The ALJ rejected these assessments on the ground that they were contrary to plaintiff's own testimony. Yet the ALJ himself noted that plaintiff testified that he had "no social life," and interacted only with his daughter, who lived with him, and his ex-wife, who assisted him. The ALJ disagreed with the psychiatrists' assessment that this degree of isolation rendered him markedly impaired in social functioning, opining that plaintiff's "ability to interact with his child and ex-wife demonstrated that [plaintiff] has the capacity to maintain adequate social functioning, and does not suffer from a marked limitation." However, the fact that the

6

ALJ disagreed with the experts' characterization of the limitations in plaintiff social functioning did not render their opinions contrary to the record.

19. The third reason the ALJ gave for affording the treating psychiatrists' opinions little weight relates to their assessment that plaintiff would "often" experience deficiencies in concentration, persistence and pace. Dr. Pekovic, who saw plaintiff monthly, noted that he had "poor concentration" and was "unable to focus on sustained activity." Dr. Ristich based his opinion on the fact that plaintiff required marked effort to perform the "serial 7s" test.

20. In rejecting these assessments, the ALJ pointed to evidence that plaintiff was able to concentrate. The ALJ noted that plaintiff testified that he could follow written or spoken directions and that plaintiff was able to complete certain discrete tasks during consultative examinations. Specifically, the ALJ noted that plaintiff could count, do simple calculations, count backwards, and register 3 objects. This evidence may have established that plaintiff could concentrate for short periods of time, but did not permit any inferences regarding plaintiff's ability to maintain concentration over a long period of time, or over a period of time sufficient to enable plaintiff to perform light work.

21. The ALJ ignored evidence that supported the treating psychiatrists' assessment of plaintiff's long-term concentration. Plaintiff testified at his hearing that he could not "concentrate enough" to continue his job as a car service driver. Dr. Barash concurred with this self-assessment, stating that plaintiff's chronic psychiatric illness resulted in "reduced sustained concentration" and a reduced "ability to adhere to a regular work routine." Dr. Fujiwaki's report, while vague, also implied that plaintiff had some concentration problems, stating that plaintiff could "maintain attention and concentration to a certain extent," but would be able to "maintain a regular schedule" only with "some difficulty." The Court notes that this evidence was crucial

7

since the vocational expert implied that sustained concentration – not the ability to concentrate for a short period – was essential to finding other work. She testified that a hypothetical individual who was capable of light work but who was "off task 20 percent of the time" would find "[n]o work competitively."

22. The ALJ's fourth and final reason for affording little weight to the treating psychiatrist's opinions related to the absence of Progress Notes. The ALJ noted that he had only two pages of Progress Notes from Dr. Pekovic and no notes whatsoever from Dr. Ristich. The ALJ did not explain what efforts he took to obtain the psychiatrists' records, but possibly implied that plaintiff exaggerated the frequency of his visits to Dr. Pekovic, stating, "while the claimant stated at the hearing that Dr. Pekovic treats him regularly, the record contains only two pages of brief notes regarding sessions in 2011." In addition, the ALJ observed that those notes indicate that plaintiff's mood and anxiety was improving with medication, and do not support the doctor's conclusions as to plaintiff's limitations.

23. Although the Court concurs with the ALJ's assessment of the few Progress Notes he had, the record suggests that these were not the only notes in existence. Dr. Pekovic himself reported having "monthly sessions" with plaintiff, and provided specific dates for the first and the most recent sessions. Plaintiff corroborated this during his September 21, 2012, interview with a social worker, telling her that he had been seeing Dr. Pekovic once or twice a month over the preceding one to two years. The doctor's report was also corroborated to some extent by the Progress Notes, which date from June 25, July 30, September 5, and October 8, 2011. The notes suggest that, at least initially, Dr. Pekovic was seeing plaintiff about once a month.

24. Although the Progress Notes for these four visits demonstrated that plaintiff's condition improved with medication, there is no reason to believe that these were the only visits

8

to his psychiatrists. To the contrary, other doctors' notes containing passing references to two subsequent psychiatric appointments. First, the Ambulatory Progress Notes relating to plaintiff's December 2, 2011, visit to Staten Island University Hospital state that plaintiff would be following up with a psychiatrist on December 5, 2011. Second, Dr. Barash's records of plaintiff's September 24, 2012, examination indicate that plaintiff said he had an appointment with Dr. Pekovic later that same day.

25. There is also evidence suggesting that the two pages of Progress Notes contained in the Administrative Record may not have been the only Progress Notes in Dr. Pekovic's possession. When Dr. Pekovic responded to the ALJ's subpoena, he requested reimbursement for photocopying eight pages. Yet, Exhibit 16F, which includes the subpoena sent to Dr. Pekovic and plaintiff's authorization to disclose the records as well as the records themselves, consists of only seven pages – one of which is entirely blank. Clearly, not all of the documents photocopied by Dr. Pekovic made it into the Administrative Record.

26. Furthermore, there is no indication that the ALJ made any effort to obtain records from Dr. Ristich. At the hearing, plaintiff's attorney reported having "great difficulty getting progress notes" from the doctors and asked the ALJ to subpoena them. The ALJ agreed to do so, stating that he would "subpoena the psych records." That same day, the ALJ issued a subpoena to Dr. Pekovic. There is no indication, however, that he subpoenaed records from Dr. Ristich.

27. Finally, the Court notes that Drs. Pekovic and Ristich were not the only physicians who treated plaintiff for his depression and whose records the ALJ failed to obtain. In late August 2010, plaintiff told a social worker that he had a history of depression and had been prescribed Zoloft, an anti-depressant, by his primary care physician. Plaintiff identified the primary care physician as a Dr. Ceka, and provided his telephone number. When questioned by

9

a Case Manager in June 2011, plaintiff reported that he was still seeing Dr. Ceka, though he was considering changing his primary care physician. In September 2012, plaintiff told Dr. Barash that he had been receiving outpatient psychiatric treatment for 4 years.

28. Taken together, this evidence implies that Dr. Ceka may have been treating plaintiff for psychiatric problems as early as 2008 – the year plaintiff was attacked in Sarajevo. Yet, despite this evidence suggesting that Dr. Ceka was the first to diagnose plaintiff's depression and to treat him for it, there is no evidence that anyone sought records from him. Indeed, the only record form Dr. Ceka is a note dated May 28, 2011, attesting to the fact that the doctor had diagnosed plaintiff with mild Achilles tendinitis.

29. In light of the ALJ's failure to develop the record, the lack of evidence regarding plaintiff's mental health treatment is not a good reason for rejecting the treating psychiatrists' assessments of plaintiff's limitations. Rather, the failure to develop the record is another ground for remanding this matter to the Commissioner for a rehearing. Upon remand, the Commissioner shall not only subpoena the records of Drs. Ristich and Ceka and obtain the missing records from Dr. Pekovic, but shall expressly consider the qualifications of these professionals, as well as the frequency, length, nature, and extent of their contacts with plaintiff.

30. For the reasons set forth above, this Court denies the Commissioner's motion for judgment on the pleadings and remands this matter to the Commissioner for a rehearing. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

                                                      U.S.D.J.

Dated: Brooklyn, New York
       February 27, 2018